## Thompson *v.* Thompson, Appellant.

*Divorce—Desertion—Evidence—Separation.*

1. Where a boy seventeen years old clandestinely marries a servant in his mother's household and takes her to his mother's home and subsequently, when the mother discovers the marriage and expresses her indignation, the wife leaves the house without any remark or conduct on her part tending to show that she intended to desert, or permanently separate herself from her husband, and thereafter the husband never offers to provide a place where they could live together, and the whole course of the conduct of the parties shows that the wife was no more

responsible than the husband for the separation, the court will not sustain a libel by the husband for divorce on the ground of his wife's desertion.

2. Separation is not desertion. Desertion is an actual abandonment of matrimonial cohabitation, with an intent to desert, willfully and maliciously persisted in without cause for two years.

3. The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent.

4. The rule generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error is not applicable in an appeal from a decree granting a divorce. In such a case it is the duty of the appellate court to consider the whole case and review the evidence at length.

Argued Dec. 13, 1911. Appeal, No. 233, Oct. T., 1911, by defendant, from decree of C. P. No. 5, Phila. Co., March T., 1911, No. 30, granting divorce in case of William D. Thompson v. Margaret M. Thompson. Before Rice, P. J., Henderson, Morrison, Orlady, Head, Beaver and Porter, JJ. Reversed.

Libel for divorce.
The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree awarding the divorce.

*James P. Fogarty*, for appellant.—There was no sufficient evidence of desertion: Stevenson v. Stevenson, 7 Phila. 386; Ball v. Ball, 23 Pa. C. C. Rep. 307; Benscoter v. Benscoter, 37 Pa. C. C. Rep. 276; Vanleer v. Vanleer, 13 Pa. 211; Middleton v. Middleton, 187 Pa. 612; Richards v. Richards, 37 Pa. 225; Ingersoll v. Ingersoll, 49 Pa. 249; Carey v. Carey, 26 Pa. C. C. Rep. 452; Angier v. Angier, 63 Pa. 450.

*Clarence E. Blackburn*, for appellee, cited: Hedderson v. Hedderson, 35 Pa. Superior Ct. 629; Whelan v. Whelan, 183 Pa. 293; Ferreira v. Ferreira, 46 Pa. Superior Ct. 129.

Opinion by Rice, P. J., May 13, 1912:
The parties to this suit were married, clandestinely,

on April 3, 1897, in Camden, New Jersey. The libelant was a little less than seventeen years old and the respondent, according to her testimony, was in her eighteenth year, but according to the finding of the master, based on declarations alleged to have been made by her, she was in her twenty-first year. The respondent was at the time a domestic servant in the employ of the libelant's grandparents in Philadelphia, doing the housework of a family consisting of his grandparents, his mother, a younger sister and an uncle. After the marriage, the parties returned to this household, and so far as outward appearances were concerned their relations thereto were unchanged until July 12, 1897. About 9 A. M. of that day, upon his own volition, according to the testimony of the libelant, but because of her insistence, according to the testimony of the respondent, the libelant divulged the fact of their marriage to his mother. Upon consideration of the evidence upon this disputed question of fact we are led to the conclusion that this disclosure was made with the assent and approval of the respondent, if not wholly because of her insistence that it should be made. The master says, and all the testimony shows, that this disclosure was a great surprise and shock to all the libelant's family and produced great excitement and commotion in the household. According to the respondent's testimony she was told in so many words that she must leave the house and many other things were said which it will serve no good purpose to quote. The mother, while denying having made some of the remarks attributed to her, admitted that owing to the excitement and commotion she had no clear recollection of what transpired. We need not undertake the task of deciding whether or not she made all the remarks attributed to her, but it is entirely within bounds to say, and of this we are convinced by the testimony, that bitter reproaches were visited upon the libelant, and particularly upon the respondent, because, to quote the language of the master, "of her seniority and her position of trust in the

family," and that other indignant and condemnatory remarks were made which, even though they were not expressly so intended, were at least well calculated to indicate to the respondent, and to cause her to believe, that her presence in that household would no longer be acceptable. It was natural and not at all to the discredit of the mother that she should feel sorely grieved and highly indignant, and that she did not at first repress manifestation of these justifiable feelings. But it is claimed that later in the day, when passion had cooled, she and the other members of the family were willing to have the respondent remain in the house, that this willingness was expressed to her, and that notwithstanding this she left the house that evening. As the learned master found that this act was of itself a willful desertion by her of her husband, it will be well to recite the evidence upon the subject. The libelant's sister, about twelve years old at that time, testified: "I remember that in the evening she came in the room where my grandfather and grandmother were, and as she entered the room she said, 'I am going now.' There was some conversation, and I don't remember all my grandfather said, but I know he said, 'You can stay,' and my grandmother said, 'You can stay,' and she said, 'No, I am going.'" The libelant's mother testified: "She just went to the door and I went with her, I was standing at the door when she went out and she said my father told her to stay and I says, 'Stay then,' and she says, 'No, I am going,' and she went out." The libelant testified that he left the house in the morning after the disclosure was made, and evidently while the excitement was at its height. He says: "Of course, there was more or less confusion at the time, and I told her to stay; then I left the house and I came back about twelve o'clock and I told her then to stay. She said she would stay and I left the house again." He did not return until after she had left which was about nine o'clock in the evening. His sister testified that as the libelant was leaving in the morning she heard him say to his wife,

"You stay." The respondent denies that she was told by anyone to stay, but she admits that the libelant's grandfather spoke to her in a friendly manner and did not seem displeased with the marriage. She further asserts that when the libelant's mother said she must go, the libelant said, "Then you go and I will take care of you." It is impossible to reconcile the conflict of testimony upon this subject, and difficult to determine where the exact truth lies. But the weight of the testimony is in favor of the conclusion that the respondent was not actually ejected from the house, as alleged in her answer, or intentionally coerced into leaving by what was said to her. But it is to be borne in mind, in determining whether her act was a willful and malicious desertion, that the expressions of the members of the family, above quoted, were made just as she was about leaving the house, and were accompanied by no intimation as to the terms upon which she could remain. Even if it be conceded that they were uttered in the utmost sincerity and good faith, it must also be conceded that they were scarcely such as necessarily or probably would counteract, at once, the effect produced upon the respondent's mind by the occurrences of the earlier part of the day. The same is true of the libelant's alleged injunction, "You stay." This would have had more significance if he had had any control in the household or had given her some assurance as to what her position in it would be. Another important matter to be noticed is that there is no evidence of any remark or conduct on her part tending to show that in leaving the house she intended to desert, or permanently separate herself from, her husband. As already stated, we do not find that she was ejected from the house. That part of the answer is not sustained by the preponderance of testimony. But when all the occurrences of the day, as well as at the very moment of leaving, are considered, we are unable to agree with the finding of the learned master that there was a willful and malicious desertion of the libelant by the respondent on July 12, 1897, when she left the house.

We are confirmed in this conclusion by what occurred afterwards. After she left she lived with respectable friends for a time, and later, down to the time of hearing, worked as a servant at various places and sometimes in a mill. A day or two after she left he visited her and according to her testimony told her not to worry, everything would be all right and they would soon be housekeeping. The following letter, which he wrote her on July 24, 1897, furnishes significant evidence as to the nature of their relations at the time:

"My Dear Wife:—

" I am sorry to no that you are so bad [she was pregnant at the time and in view of her condition had asked him for money] but I am going down to Charley Wright to get Jim [a dog] and going to sell him but I had to do it. I am trying to get something to do but cannot find it. They may put me in some business after while. The reason that I did not get up last night was that I had a cold and did not want to go out. But I am all right now. I will try to get up next week sure so don't you cry no more about so.

" Yours truly, Your loveing husband,

" W. D. THOMPSON."

Apart from this letter, the evidence is abundant and convincing that from the day after she left his mother's house (July 12, 1897) until the latter part of September, he not only visited her frequently but on these visits cohabited with her as his wife. It is true he did not take up his abode with her and did not support her, but it is impossible to conclude that during the period of such relationship there was a willful and malicious desertion being persisted in.

About September 16, 1897, being disappointed in her expectation of his visiting her that morning, as he had promised to do, she went to his home and inquired for him but was told by his mother that he was not at home. She also made a visit to his home for the same purpose

on a previous occasion and with the same result. We remark in passing that the mother admits that she made no request or suggestion on either of these occasions that the respondent should return. In the fall of 1897, the respondent prosecuted the libelant for nonsupport, and in December of that year the court of quarter sessions made an order on him for payment of $3.00 weekly to his wife for the support of herself and expected child. Their child was born on January 21, 1898, and is still living. In February of the same year the respondent brought an action of trespass against the libelant's mother for alienation by her of the affections of her husband. The undisputed testimony shows that after the child was born and the suit for alienation had been brought, the libelant visited the respondent on at least two or three occasions at the home of Mrs. Newport, where she was then living, and, according to the testimony of the respondent, asked her to withdraw that suit. The libelant admits that he visited her about this time. He distinctly admits also that he did not ask her on these occasions to come back to his mother's house, and he does not allege that he proposed to provide another place where they could live together. That he made no such proposition and that he had no such purpose in these visits is not only shown by the testimony of the respondent and the corroborating testimony of Mrs. Newport, but is apparent from his own testimony, a part of which we quote: "Q. How did you come to visit here there? A. I wanted to see her. She had caused a lot of disturbance about that time. I went to see her about it. Q. What kind of disturbance and trouble did she cause? A. Well, she had a bench warrant out for my arrest. Q. What for? A. For support. Q. And what did you want to see her about? A. I went to keep her from coming to the house. Q. What did you want to see her about? A. I went up to see her; she said she wasn't supported—this came from her counsel, Charles Davis. I went up there to see her in regards to that." This testimony is entirely inconsistent with

the idea that the respondent was remaining away from the libelant's home against his desire, expressed or otherwise, that she should return to it. Indeed the whole testimony inevitably leads to the conclusion, that her dwelling in the house of Mrs. Rinker, where she first went, and afterwards in the house of Mrs. Newport, where their child was born, and where she was domiciled at the time the visits last referred to were made, was under circumstances which clearly and unmistakably repel any presumption of willful and malicious desertion on her part.

The exact date of the last of these visits by the libelant to the respondent cannot be stated with absolute certainty, but under all the testimony it was not later than June, 1898. According to the oral testimony of both parties, for a period of about nine years thereafter they did not meet, and except for the two notes written by him to her in 1906 hereafter quoted, they appear not to have been in communication. But we can find no direct evidence, or ground of presumption from anything that was said or done during this period, or at their last meeting in 1898, which would sustain a finding that she more than he was responsible for this separation. "Separation is not desertion. Desertion is an actual abandonment of matrimonial cohabitation, with an intent to desert, willfully and maliciously persisted in without cause, for two years:" Ingersoll v. Ingersoll, 49 Pa. 249; Middleton v. Middleton, 187 Pa. 612; Cooper v. Cooper, 37 Pa. Superior Ct. 246; Merrick v. Merrick, 43 Pa. Superior Ct. 13. The guilty intent to desert is rebutted where the separation is encouraged by the other party or by mutual consent. Mutual consent to the separation, not revoked by either party, is as fatal to an application for divorce on the ground of desertion as would be acts on the part of the libelant which would give the respondent legal cause to leave him. Upon this subject we refer to the opinion of Judge King in Butler v. Butler, 1 Parsons' Sel. Eq. Cases, 329, the doctrine of which has been recognized in many subsequent cases. See also Vanleer v.

Vanleer, 13 Pa. 211; 1 Bish. Mar., Div. & Sep., sec. 1667. Again, the mutual consent that will prevent a divorce upon the ground of desertion may be inferred from the conduct of the parties, and need not be put in the form of a solemn written agreement: Olson v. Olson, 27 Pa. Superior Ct. 128; King v. King, 36 Pa. Superior Ct. 33. Viewing the testimony in the light of these well-settled principles, we unhesitatingly conclude that the most unfavorable inference against the respondent that can be legitimately drawn from the conduct of the parties is, that the separation during these nine years, or thereabouts, was with the tacit assent of each.

Late in the year 1907, or early in the year 1908, communication between the parties was reopened by correspondence and personal interviews at appointed places, and this was kept up until the latter part of April, 1908. It is the contention of the libelant that in these interviews he requested the respondent to return to his mother's home and live with him there, that he was authorized by his mother to make this offer, and that the respondent refused to accede to it, she insisting that a money settlement should be made instead. The respondent positively denies that such offer was made, and asserts that his repeatedly expressed desire was that they should be divorced, and that what was said between them relative to the payment of money to her in settlement, or providing a house for her (see letter of April 13, 1908) was said in connection with and as part of his proposition that they be divorced. That there was discussion of a money settlement is a fact evidenced by the correspondence as well as by the oral testimony of both parties; but upon the main question, namely, whether in the course of these interviews in 1908, he made a bona fide request that she take up her abode with him at his mother's house, which she rejected, the oral testimony of the libelant and the respondent is irreconcilable. The fact that a money settlement was the subject of discussion between them does not aid us in deciding that conflict, because, as we

have seen, they wholly disagree as to its purpose.    Nor are we aided in deciding the conflict by the oral testimony of any witness who was present at any of these interviews. Inherently, the testimony of the respondent upon this question of fact now under consideration is as probable as that of the libelant, and is quite as consistent with the previous conduct of the parties.    Contradictions of, and discrepancies in, her testimony as to other matters, and particularly as to the proceeding for divorce a mensa et thoro she instituted in 1903, are pointed out in the master's report in great detail as affecting her general credibility, and we are not disposed to minimize them or to dismiss them as trifling.    But it is also true that the libelant was contradicted in material matters by other evidence than the respondent's, that his testimony is not wholly free from discrepancies, and does not in all its parts exhibit entire candor, particularly in that part in which he was first asked to explain the meaning of some of his letters.    We shall not attempt to analyze the testimony of either party in detail.    The truth is that the testimony of both exhibits the bias, that is the natural, or at least the common, result of such interest as each had; but we are clearly convinced that the entire testimony of neither can be rejected as coming from a person unworthy of belief in any particular.    Nevertheless, the testimony of both upon the question now under consideration cannot be true, and if it rests in equilibrio the libelant's case fails because the burden of proof rests on him.    But before concluding that the substantial truth cannot be ascertained it is incumbent on us to exhaust all means for ascertaining it that are within our reach, and therefore we turn to the correspondence.

On May 6, 1906, the libelant wrote the respondent as follows: "My Dear Maggie.    Meet me to night Wednesday at 7.30 sharpe Cornor 6th & Cambria South West cornor I will not keep you over 5 minutes.    (Don't say where you are going to anybody) be there prompt for I cannot wait."

About the same time he wrote her as follows: "My Dear Maggie: Will you meet me to night Thursday at the S. E. Cor. of 6th & Cambria Sts. as I want to have a talk with you (come alone and say nothing about it). Meet me at 7:30 sharp rain or not."

The next letter is undated and reads: "My Dear Maggie: Enclosed find 5.00 it will help to buy some of your clothes it is all that I can give you. (It will be best if you do not acknowledge the receipt of this not as I might not get and it would cause trouble.")

The respondent explains that he had asked her the night before to meet him, that she had told him her clothes "weren't really presentable to go out," and that this letter came through the mail the next morning.

The next letter is undated, but it was evidently written in January, 1908, for it requested her to meet him at the Reading Terminal on January 8. We quote the main part of the letter: "Try your best to meet me Tuesday. (I don't want you to mention this letter to any one or say anything about it.) I have not told any one a thing about it. I don't want you to be afraid to meet me as I only want to have a personal friendly interview with you. (I want you to come alone) and try to be there at 8 o'clock sharpe as I will not wait any longer than 8:30 for you. If neither of these evenings suit you please let me know what evening will suit you you can write to me direct (nobody will know anything about it)."

On March 2, 1908, he wrote her as follows: "My Dear Maggie:—I wish you would meet me at the Reading Terminal down stairs by the ticket window at the same place you met me before any day or evening that suit you.

"(Come alone the same as you did before) only you need not be so frightened for nothing will happen you. Let me know the day and time, make it as soon as you can.

"Enclosed find an envelope addressed you can use it so no body will now who it is from).

"I do not want you to say anything about this letter to anyone for I want to have personal talk with you.

"Sincerely yours,

"W. D. Thompson.

"P. S. Do not make it Friday evening."

On March 12, 1908, he wrote her acknowledging the receipt of a letter from her that morning and requesting her to meet him at a certain street corner. He says: "We could take a little walk and talk like we did last time we met. I want you to answer this letter as soon as you get it. . . . come as early as you can for I always have a good bit to say. (Enclosed find envelope addressed. I had it typewritten so nobody would know who it is from.) The envelope is all stamped ready for use." On March 17, he wrote asking her to answer his letter immediately and to appoint the place. "If you are not living at 2955 N. 4th St. you should have sent me you right address you received that letter last Friday morning. I should have had a dozen answers by this time. I want to see you this week sure."

Again on March 21, he wrote: "My dear Maggie: I will call and see you Friday afternoon March 27th, 1908. I wish you to come to the door yourself and (I want to see you alone) you need not be afraid I will not touch you, you say that you only work in the mornings so it will not interfere with your work. Do not answer this letter if it will be all right for me to call, if not let me know immediately but try to make it all right for me to call."

His letter of March 30, reads: "My Dear Maggie: I will call and see you Wednesday afternoon April 1st, that is if you have no objection, if you have work do not stay home for me because I will you see again. (There is no use to answer this letter) you can leave word with your aunt if you are working but I hope to see you."

On April 2, he wrote: "My Dear Maggie: I will call to morrow Friday morning about 8:45 to 9 o'clock to see you I thought that you might not have work in the morning but if you have work I want you to go, and I will call

in the afternoon to see you I am doing this because you have been home several mornings if you go to work in the morning I want you to stay home in the afternoon I will pay you for the time you will lose. It is no trouble for me to call twice."

On April 13, he wrote: My Dear Maggie: My family will not pay the sum you name for they have not got it to pay. My advice is that you do as I want you to do and I will stick by you and do all I said I will do. I only want you to trust me for I am anxious to get a start it is the best thing for you and the only way you can get a house. Let me know if you are willing or not write to night and if you want to see me I will name a place and meet you there. I hope you will do what I say for I know you will never regret it. I will do the best I can for you now write to night and let me know."

On the following day she wrote to him: "My Dear Will: Your letter received. In regards to our conversation about money matters. You had my decision when I saw you last which is I think a very small amount. You say you people will not pay that. Will you must know that your separation will never Free me I am married till Death does us part. So then if they are not willing to give that why then leave things as they were as I am worried sick over the whole affair. As you know that I don't want any divorce. Will write & let me know if this is all right or not. I do not know what day we will have off. I will write when you answer this. You looked for an answer all day but I had a very sick headache & could not answer your letter last night. Will I think it is best for you to come up Than me to meet you any place. Write me & let me know when you coming.

"Good Bye Your wife,
"Margaret Thompson."

His reply, dated April 16, reads as follows: "My Dear Maggie: Yours of the 14th inst. received and I have tryed hard to get it but have failed. I will see you Saturday morning April 18th about 9:30 A. M. You come to the

door yourself it is no use for you to worry yourself it is bad enough for me to worry I am trying to do everything for the best.  I do not intend to get you to do something that will not help you and I will not bother you again but I thought that a talk would do no harm if you have any objection to me calling write me.  I hardly think I would get a letter in time from you so I guess I am safe if you have work I want you to go and not stay home for me.

" Believe me,

" W. D. Thompson."

We remark, in the first place, the desire of the libelant for secrecy which many of these letters indicate, and the pains taken by him to prevent any one knowing from whom her letters to him came.  We have indicated some of these passages by enclosing them in parentheses.  If it be true that at this time he was soliciting the respondent to return to his home and that this was with the knowledge and approval of his family, we can see no occasion for this secrecy and for taking such pains.  Again, and this it seems to us is very significant, none of the letters contain any request that she return to his mother's home, or even indicate with any degree of certainty that this was the subject of their oral interviews.  The passages in his letter of April 13, "My advice is that you do as I want you to do and I will stick by you and do all I said I will do," and "it is the best thing for you and the only way you can get a house," and the passage in his letter of April 16, "I do not intend to get you to do something that will not help you," are quite as consistent, and when considered with the context and the entire correspondence are more consistent, with the respondent's testimony that the subject of discussion was his proposition that they be divorced and that money be paid her or that a house be provided for her, and their daughter sent to boarding school.  It makes no difference whether the offer of money was made by him or the demand for money came from her, so long as the offer or demand was con-

nected with his proposition that they be divorced.  And this, after full and deliberate consideration of the oral testimony and the correspondence, we are constrained to believe was the case, and not that a demand for money was made by her as a substitute for his proposition that she return to his mother's home and live with him there. As already intimated, the burden of proving that such proposition was made by him in good faith and that she rejected it rested on him, and our conclusion is that it is not established by the clear preponderance of testimony.

The rule that should control in the examination and disposition of a divorce case coming before the appellate court as this does has been repeatedly expressed; but we need only refer to Middleton v. Middleton, 187 Pa. 612, as authority for saying that the rule, generally applicable to proceedings before a master or an auditor, that a finding of fact will not be disturbed except for manifest error, will not be applied in such cases.  The admonition repeatedly made in the decisions that the courts ought never to sever the marriage relation but when the application is made in sincerity and truth, for the cause set forth, and no other, and is fully sustained by the testimony, is as binding on the appellate court as upon the court of common pleas.  We have therefore reviewed the evidence at length, and notwithstanding the able report of the master and the action of the learned court thereon we feel compelled to a different conclusion.

The decree is reversed and the libel is dismissed at the costs of the libelant.